# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSE LEBRON,
*Plaintiff*,

v.                                          No. 3:22-cv-155 (VAB)

STATE OF CONNECTICUT,
DEPARTMENT OF SOCIAL SERVICES
*Defendant.*

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Jose L. Lebron ("Plaintiff") has filed this lawsuit *pro se* against the State of Connecticut Department of Social Services (the "DSS" or "Defendant"), alleging that the DSS failed to promote him on the basis of his race and gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq. See* Compl., ECF No. 1 (Jan. 27, 2022) ("Compl.").

The DSS has moved for summary judgment as to Mr. Lebron's claim. Mot. for Summ. J., ECF No. 38 (Aug. 18, 2023) ("Mot.").

For the following reasons, Defendant's motion for summary judgment is **GRANTED.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

Mr. Lebron identifies as a Hispanic male of Puerto Rican descent. Local Rule 56(A)1

---

[1] This section includes facts disputed by Mr. Lebron under Fed. R. Civ. P. 30(e). For the reasons discussed in Section III(A), the Court has disregarded Mr. Lebron's objections under Rule 30(e), as they are based on a misreading of the Rule. Moreover, because Mr. Lebron admitted many of these facts during his deposition, and has failed to provide specific citations to support his objections, the Court will deem the facts admitted under District of Connecticut Local Rule of Civil Procedure 56(a)(3) ("[E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or

Statement of Undisputed Material Facts ¶ 2, ECF No. 38-2 (Aug. 18, 2023) ("Def. Facts"); Local Rule 56(A)2 Statement of Facts in Opp'n to Summ. J. at 2, ECF No. 42 (Oct. 4, 2023) ("Pl. Facts").

Mr. Lebron is employed by the DSS as a Principal Cost Analyst ("PCA"). Def. Facts ¶ 1; Pl. Facts at 2.

Nicole Godburn is a white woman who was employed by the DSS as a PCA. Def. Facts ¶ 40.

On or about December 13, 2019, there was a vacant Fiscal Administrative Manager 2 ("FAM 2") position at the DSS. Def. Facts ¶ 3; Pl. Facts at 2.

DSS, through Ms. Letonia Wright, Human Resources Specialist, posted the FAM 2 position on the Department of Administrative Services ("DAS") website. Def. Facts ¶ 4.

After the FAM 2 position was posted to the DAS website, Ms. Wright understood that DAS had done an initial vetting of the candidates to determine which candidates met the minimum qualifications for the position. *Id.* ¶ 6.

Ms. Wright received a list of eligible candidates and performed her own screening to confirm that the candidates met the minimum qualifications. *Id.* ¶ 7. It was Ms. Wright's practice to rely on the candidates' representations of their work histories, and she did not check the applications for accuracy. *Id.* ¶ 8.

On or about December 19, 2019, Mr. Lebron applied for the FAM 2 position. Def. Facts ¶ 9; Pl. Facts at 3.

On or about February 2020, Mr. Lebron was interviewed for the FAM 2 position. Def.

---

(2) other evidence that would be admissible at trial. . . . Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions[.]").

Facts ¶ 10; Pl. Facts at 3.

The interview panel for the FAM 2 position consisted of Amanda Kate McEvoy (Director of the Division of Health Services), Michael Gilbert (Deputy Commissioner), and Anthony Judkins (Social Services Program Manager) (collectively, the "Panelists"). Def. Facts ¶ 11.

The FAM 2 position had both Minimum Qualifications and Preferred Qualifications. *Id.* ¶ 12. The Preferred Qualifications included, "[e]xpertise in health insurance rate setting and value-based payment approaches." *Id.*

A value-based payment initiative shifts the traditional health insurance reimbursement model such that payment is not linked to the volume of services, but rather to specific outcomes (e.g. improved quality of care, access, and experience). *Id.* ¶ 13.

The DSS was interested in implementing value-based payment initiatives, in keeping with the priorities of the Centers for Medicare and Medicaid Services, the federal agency that oversees Medicaid. *Id.* ¶¶ 15, 17, 18. The Agency therefore sought to hire a candidate for the FAM 2 position who had experience with similar initiatives. *Id.* ¶ 18.

The Panelists were instructed by the DSS Human Resources Department to select the most qualified candidate based primarily on their interview performance. *Id.* ¶ 20.

The Panelists asked the same questions to each candidate and did not deviate from the questions. *Id.* ¶ 21.

Interview Question #3 stated, "Describe your experience in developing the financial components of a value-based payment." *Id.* ¶ 24.

In response to this question, Mr. Lebron stated that he "ha[d] not done this" and described general knowledge of the premise of value-based programs. *Id.* ¶ 25.

In response to Question #3, Ms. Godburn spoke about her experience with the PCMH+

program, which is a value-based payment program. *Id.* ¶ 32. She also spoke about how value-based payment initiatives can identify desired outcomes and quality measures and reward providers for achievements, drawing on her experience. *Id.*

Interview Question #12 asked, "You have to explain value-based payment to legislators in a public forum. How would you approach this?" *Id.* ¶ 29.

In response to Question #12, Mr. Lebron said, "As simply as possible. They are busy and need something streamline[d] so they can understand why, what and how much it will save." *Id.* ¶ 30.

Ms. Godburn's response to Question #12 contained more detail and highlighted her experience explaining value-based payment approaches to stakeholders. *Id.* ¶ 34.

After the interviews, the Panelists unanimously selected Ms. Godburn based on her experience with value-based payment initiatives. *Id.* ¶ 39.

In the course of this litigation, Ms. Wright learned that there was an inaccuracy in Ms. Godburn's application: instead of separating out her jobs at the DSS, she indicated that she had been a PCA throughout the course of her employment with the Agency. *Id.* ¶ 40. In actuality, Ms. Godburn had been a PCA for approximately 18 months and a Fiscal Administrative Officer for approximately five years. *Id.*

The error in Ms. Godburn's application did not affect her eligibility for the FAM 2 position because, taken together, her experience met the minimum qualifications for the position. *Id.* ¶ 41.

The Auditors of Public Accounts published two reports relevant to this case. *Id.* ¶¶ 57, 69.

One report found that, on November 5, 2018, the DSS had posted a promotional

opportunity within one division of the DSS, rather than posting it on a department-wide basis. *Id.*
¶ 57. The report pertained to a PCA position for which Mr. Lebron was on the selection
committee. *Id.* ¶ 58. Mr. Lebron and the panel selected Ms. Godburn and another candidate. *Id.* ¶
61.

The second report found that the DSS had promoted an employee without confirming that
the candidate met the special experience requirement for the position. *Id.* ¶ 69. Based on his
communication with an employee of the Auditors of Public Accounts, Mr. Lebron believed that
this report applied to Ms. Godburn's promotion, as well as to other promotions. *Id.* ¶ 70.

### B.  Procedural History

On January 27, 2022, Mr. Lebron filed the Complaint, alleging that the DSS failed to
promote him on the basis of his age, race, and gender, in violation of Title VII and the Age
Discrimination in Employment Act of 1967 ("ADEA"). Compl.

On June 24, 2022, the DSS filed a motion to dismiss the Complaint for failure to state a
claim and lack of subject matter jurisdiction. Mot. to Dismiss, ECF No. 19.

On July 18, 2022, Mr. Lebron filed a response to the motion to dismiss. Resp. to Mot. to
Dismiss, ECF No. 22.

On August 1, 2022, the DSS replied to Mr. Lebron's response. Reply to Response to Mot.
to Dismiss, ECF No. 30.

On September 1, 2022, Mr. Lebron filed an objection to the DSS's motion to dismiss.
Obj. re Mot. to Dismiss, ECF No. 29.

On September 15, 2022, the DSS filed a reply to Mr. Lebron's objection. Reply to Pl.'s
Second Objection to Def.'s Mot. to Dismiss, ECF No. 30.

On November 10, 2022, the DSS filed a motion to stay discovery pending the Court's

decision on the motion to dismiss. Mot. to Stay Discovery, ECF No. 31.

On January 13, 2023, the Court granted in part and denied in part the DSS's motion to dismiss. Ruling and Order on Mot. to Dismiss, ECF No. 32. More specifically, the Court dismissed Mr. Lebron's ADEA claim and his claim for punitive damages under Title VII but allowed Mr. Lebron's Title VII claim to move forward. *Id.*

On August 18, 2023, the DSS filed a motion for summary judgment on Mr. Lebron's remaining claims.[2] Mot.

On October 4, 2023, Mr. Lebron filed a memorandum of law in opposition to the motion for summary judgment. Mem. of L. in Opp'n of Mot. for Summ. J., ECF No. 42 ("Opp'n").

On October 9, 2023, the DSS filed a reply to Mr. Lebron's response to the motion for summary judgment. Reply to Response to Mot. for Summ. J., ECF No. 47 ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine*

---

[2] In his opposition, Mr. Lebron states that the DSS failed to file a Notice to Self-Represented Litigant Regarding Summary Judgment, as required by Local Rule 56(b). *See* D. Conn. L.R. Civ. P. 56(b). The Court notes that Defendant did file such a notice on the same date that it filed the motion for summary judgment. *See* Notice, ECF No. 39 (Aug. 18, 2023).

issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and

draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict[.]" *Anderson*, 477 U.S. at 250.

### III.    DISCUSSION

Mr. Lebron has sued the DSS under Title VII for disparate treatment on the basis of his race and gender, arising from the DSS's failure to promote him to the FAM 2 position and its hiring of Nicole Godburn, a white woman. Compl. at 7–8.

The DSS has moved for summary judgment, arguing that Mr. Lebron has failed to establish a *prima facie* case of disparate treatment, or in the alternative, that Mr. Lebron has failed to provide any evidence suggesting that Ms. Godburn was hired for any reason other than her superior qualifications. Mem. in Supp. of Mot. for Summ. J.at 4, ECF No. 38-1 (Aug. 18, 2023) ("Mem.").

The Court first addresses Mr. Lebron's objections to the DSS's Local Rule 56(A)1 Statement of Facts, and then addresses each of the DSS's arguments in turn.

### A.  Mr. Lebron's Factual Objections

#### a.   Objections Under Federal Rule of Civil Procedure 30(e)

In his response to the DSS's Local Rule 56(A)1 Statement of Material Facts, Mr. Lebron denies a number of factual allegations on the basis of alleged violations of Federal Rule of Civil Procedure 30(e). *See, e.g.*, Pl. Facts at 3 ("Plaintiff Jose Lebron denies in part. Defendant Department of Social Services is referring to a deposition the Plaintiff Jose Lebron was given.

Federal Rule 30(e) says that depose[d] Plaintiff Jose Lebron shall sign[] or waive his signature none of which the Plaintiff Jose Lebron did."). Mr. Lebron seems to argue that his own statements or admissions at the deposition may not be used by the Defendant in its motion for summary judgment because he did not sign the deposition transcript or waive his right to sign.

This is a misreading of Rule 30(e), which states in its entirety:

(e) REVIEW BY THE WITNESS; CHANGES.
   (1) *Review; Statement of Changes.* On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
   (A) to review the transcript or recording; and
   (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.
   (2) *Changes Indicated in the Officer's Certificate.* The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

Fed. R. Civ. P. 30(e). Rule 30(e) therefore allows a deponent to review and correct the transcript or recording of their deposition upon request, and requires a signature only where the deponent makes changes to the record of the deposition.

Here, there is no evidence that Mr. Lebron ever requested the opportunity to review the transcript of his deposition. Given that his deposition took place on June 26, 2023, approximately nine months ago, even under the relaxed standards applied to *pro se* litigants, Mr. Lebron has forfeited his opportunity to request such a review. *See, e.g.*, *Sabino v. Port Auth. Police Dep't*, 21-CV-05731 (JGK) (BCM), 2023 WL 2977991, at *2 (S.D.N.Y. Mar. 15, 2023) (granting the *pro se* plaintiff's request to review transcripts from his depositions, which had taken place approximately four to five months prior); *Desrameaux v. Delta Air Lines, Inc.*, 2:15-CV-347 (CBA) (VMS), 2018 WL 1224100, at *3 n.5 (allowing the *pro se* plaintiff to submit notarized "errata" sheets for her November 5, 2015 deposition on February 19, 2016, despite their untimeliness).

Moreover, even if Mr. Lebron were to request an opportunity to review his testimony, such review would not permit him to alter his testimony. Indeed, "while Rule 30(e)(1) permits a deponent to make changes to his testimony, his original testimony is not thereby stricken. Rather, his original answers 'will remain part of the record and can be read at the trial.'" *Sabino*, 2023 WL 2977991, at *2 (quoting *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997)).

Accordingly, the Court will disregard Mr. Lebron's objections under Rule 30(e).

The Court also notes that many of Mr. Lebron's factual objections cannot be credited because they do not contain specific citations to admissible evidence in the record, as required by both the Local Rules and Second Circuit caselaw. *See, e.g.*, D. Conn. L.R. Civ. P. 56(a)(3) ("[E]ach denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial. . . . Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1, or in the Court imposing sanctions[.]"); *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (When opposing summary judgment, the non-moving party may not "rely on conclusory allegations or unsubstantiated speculation[,]" but rather "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.").

Accordingly, the Court will deem admitted any facts to which Mr. Lebron has objected without citing to evidence in the record.

### B.  The Title VII Claim

Under Title VII, it is "an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Employment discrimination claims brought under Title VII are analyzed under the framework set forth in *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973). *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

Under this framework, a plaintiff must first establish a *prima facie* case of intentional discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination. *Littlejohn*, 795 F.3d at 311. A plaintiff's burden for establishing a *prima facie* case is *de minimis*. *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have characterized plaintiff's prima facie burden as 'minimal' and 'de minimis.'") (citing *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).

Once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07 (1993) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)). To do so, "'the defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center*, 509 U.S. at 507 (emphasis in original) (quoting *Burdine*, 450 U.S. at 254–55, n.8). The defendant's burden is one of production, but "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

"If the defendant successfully articulates such nondiscriminatory reasons, the plaintiff is given the opportunity to show that [the] defendant's reasons were merely a pretext for discrimination." *Zenni v. Hard Rock Cafe Int'l, Inc. (N.Y.)*, 903 F. Supp. 644, 650 (S.D.N.Y. 1995); *see also Richard v. New York City Dep't of Education*, No. 16-cv-957 (MKB), 2022 WL 4280561, at *21 (E.D.N.Y. Sept. 15, 2022). In order to prove that the defendant's reasons were pretextual, "[t]he plaintiff must establish by a preponderance of the evidence 'both that the reason was false, and that discrimination was the real reason.'" *Zenni*, 903 F. Supp. at 650 (quoting *Fisher v. Vassar College*, 66 F.3d 379, 392 (2d Cir. 1995)).

If a plaintiff can show that the defendant was, in fact, motivated even in part by the prohibited discriminatory animus, the court should deny summary judgment. *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.")

a. The *Prima Facie* Case

In the context of a failure-to-promote claim, in order to establish a *prima facie* case of intentional discrimination, a plaintiff must show that: "1) he is a member of a protected class; 2) he applied for promotion to a position for which he was qualified; 3) he was rejected for the position; and 4) the employer kept the position open and continued to seek applicants." *Mauro v. Southern New England Telecomm., Inc.*, 208 F.3d 384, 386 (2d Cir. 2000). Where, like here, the case involves a position that has been filled, the Second Circuit uses a more generic formulation

of the fourth element: "whether 'the circumstances of the [failure to promote] give rise to an inference of discrimination.'" *Martinez v. Davis Polk & Wardwell LLP*, 208 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003)) (alterations in original).

A showing that the position was filled by a similarly situated individual not in the plaintiff's protected class is generally sufficient to satisfy the fourth element. *See de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996) (finding that the plaintiff satisfied the fourth prong of the *prima facie* case because he, a Puerto Rican man, was replaced by a Black female); *Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003) ("[T]he circumstances under which [the plaintiff] was not selected give rise to an inference of discrimination on the basis of race because his application is marked with his race and the position was offered to an allegedly significantly less qualified African-American man.").

For the purposes of the motion for summary judgment, the DSS concedes that Mr. Lebron has met his burden with respect to the first three prongs. The DSS argues, however, Mr. Lebron "has put forth no evidence that would meet the standard to establish that the FAM2 promotion occurred under circumstances giving rise to an inference of discrimination." Mem. at 5. The DSS emphasizes that Mr. Lebron has failed to identify any comments by any decisionmakers that could be viewed as reflecting a discriminatory animus. *Id.* It further argues that Mr. Lebron has drawn "faulty presumptions" from "a purported organizational chart" and reports from the Auditors of Public Accounts. *Id.*[3]

Although he does not explicitly address the elements of a *prima facie* case, Mr. Lebron

---

[3] In prior filings, Mr. Lebron referenced two reports written by the Auditors of Public Accounts, *see* ECF No. 1 at 18 (Jan. 27, 2022), as evidence of problems with the DSS's hiring process. As Defendant notes, *see* Reply at 8, Mr. Lebron seems to have abandoned these arguments in his response to the motion for summary judgment, as well as in his Local Rule 56A(2) statement. Moreover, neither of the reports involved racial discrimination or was otherwise

effectively argues that the circumstances of Ms. Godburn's hiring are sufficient to support an inference of discrimination. Mr. Lebron argues, and the DSS has admitted, that "[b]oth [he] and Ms. Godburn met the minimum qualifications for the FAM2 position." Mem. at 6. In his view, because both were qualified for the job and Ms. Godburn was not a member of Mr. Lebron's protected class (Hispanic male), Ms. Godburn's promotion was sufficient to satisfy the fourth element of the *prima facie* case.

The Court agrees.

As noted above, a plaintiff's burden for establishing a *prima facie* case is *de minimis*. *Woodman*, 411 F.3d at 76. And, contrary to the DSS's arguments, direct evidence of discrimination is not required at this stage of the inquiry.

Mr. Lebron has successfully established that: (1) he is a member of a protected class (Hispanic male); (2) he was minimally qualified for and applied for the FAM 2 position; (3) he was rejected for the position; and (4) a similarly situated non-Hispanic male candidate was selected for the position.

Taken together, these facts—which are not meaningfully disputed by Defendant—are sufficient to establish a *prima facie* case. *See, e.g.*, *de la Cruz*, 82 F.3d at 21 (finding that the district court erred in granting summary judgment, and the plaintiff had established a *prima facie* case of discrimination, where the Puerto Rican male plaintiff had overall positive performance evaluations—albeit with some dispute regarding specific job skills—and was replaced by a Black female candidate); *Mandell*, 316 F.3d at 379 (finding that the plaintiff established a *prima facie* case where the defendant promoted multiple Catholic officers with similar qualifications and lesser or comparable seniority as the plaintiff, while declining to promote the Jewish

---

related to Mr. Lebron's claims. The Court therefore declines to address any arguments related to the Auditors' reports.

14

plaintiff); *compare with Gonzalez v. Connecticut*, 151 F. Supp. 2d 174, 181 (D. Conn. 2001) (finding that the plaintiff failed to establish a *prima facie* case of discrimination because he did not have, nor was he interested in pursuing, a license required for the job he sought); *Martinez*, 208 F. Supp. 3d at 480 (finding that the plaintiff failed to establish a *prima facie* case of discrimination because she did not possess relevant bachelor's and master's degrees, in contrast to the candidate who was selected, nor did she have similar practical experience with computers, certain programs, social media, and email marketing, all of which were described as requirements in the job description).

Accordingly, the Court will proceed to the next phase of the *McDonnell-Douglas* framework.

### b.  The DSS's Legitimate, Nondiscriminatory Reasons for Hiring Ms. Godburn

The DSS argues that it made the decision to hire Ms. Godburn because she had superior qualifications and was the better candidate for the FAM 2 position. Mem. at 4. The DSS explains that, while both Mr. Lebron and Ms. Godburn met the minimum qualifications for the position, the DSS had also enumerated certain preferred qualifications related to broader agency priorities, which only Ms. Godburn possessed. *Id.* More specifically, the DSS had listed experience with value-based payment initiatives as a preferred qualification for the FAM 2 position, given that the agency was interested in experimenting with implementing such initiatives in Connecticut. *Id.* at 6; Def. Facts ¶ 18. The DSS emphasizes that "Defendants are entitled to pick between comparably qualified employees, may rely on any non-discriminatory basis in doing so, and may consider somewhat subjective factors such as interview performance as well as the candidates' qualifications on paper in making their hiring and promotions decisions." *Lomotey v. Conn.*

*Dep't of Transportation*, Civil No. 3:05-cv-1711 (PCD), 2009 WL 82501, at *8 (D. Conn. Jan. 12, 2009).

The Court finds that the DSS's proffered reason for hiring Ms. Godburn satisfies its burden under *McDonnell Douglas*. *See St. Mary's Honor Center*, 509 U.S. at 507 (explaining that, at this stage, the defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action).

The DSS has provided the job posting for the FAM 2 position, which includes, under "Preferred Qualifications," "[e]xpertise in health insurance rate setting and value-based payment approaches." Fiscal/Administrative Manager 2 Job Posting, Ex. 2, ECF No. 38-5 at 6 (Aug. 18, 2023). The DSS has also provided sworn affidavits of numerous individuals involved in the hiring process, who attested that value-based payment initiatives were a priority of the agency, and that the agency sought to hire a candidate with relevant experience. *See* Affidavit of Amanda Kate McEvoy ¶ 9, Ex. 3 to Mot., ECF No. 38-6 (Aug. 18, 2023) ("McEvoy Aff."); Affidavit of Michael Gilbert ¶ 9, Ex. 4 to Mot., ECF No. 38-7 (Aug. 18, 2023) ("Gilbert Aff."); Affidavit of Anthony Judkins ¶ 4, Ex. 5 to Mot., ECF No. 38-8 (Aug. 18, 2023) ("Judkins Aff."). The Panelists have also attested that, when asked about their experience developing the financial components of a value-based payment system, Mr. Lebron stated that he did not have any relevant experience, while Ms. Godburn spoke about her experience with the PCMH+ program, a value-based payment initiative. Def. Facts ¶¶ 26–28, 32–34; McEvoy Aff. ¶¶ 14, 16; Gilbert Aff. ¶¶ 15, 17; Judkins Aff. ¶¶ 9, 11. The DSS has also provided the Panelists' contemporaneous notes from the interviews of Mr. Lebron and Ms. Godburn, which reflect the same.

Accordingly, the Court finds that the DSS has met its burden to produce evidence

sufficient to suggest that it hired Ms. Godburn for a legitimate, nondiscriminatory reason—namely, her experience with value-based payment initiatives. *See Burdine*, 450 U.S. at 253 (holding that the defendant's burden is merely one of production, and emphasizing that "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff").

           c.  <u>Proof of Pretext</u>

Mr. Lebron argues that the DSS's proffered reason for hiring Ms. Godburn is pretextual. He states that "[t]here are three ways to prove discrimination[:] circumstantial evidence, direct evidence and pattern and practices[,]" and explains that he is asserting "the latter." Opp'n at 19 (citing *Yarbrough v. Glow Networks, Inc.*, No. 4:19-CV-905, 2022 WL 11174032 (E.D. Tex. Feb. 18, 2022); *Equal Employment Opportunity Commission v. Birmingham Beverage Co., Inc. dba Alabev*, Civil Action No. 2:17-CV-01651-MHH (N.D. Al. June 4, 2021)). Mr. Lebron, in fact, offers several distinct theories as to why the DSS's proffered nondiscriminatory reason for hiring Ms. Godburn is pretextual.

First, Mr. Lebron argues that he was the superior candidate for the FAM 2 position. In support of this contention, Mr. Lebron argues that he had more experience working as a PCA than Ms. Godburn. Opp'n at 43. Additionally, Mr. Lebron argues that, in order to advance to the interview stage of the process, Ms. Godburn "knowingly lied on her application" regarding the number of years that she had served as a PCA, and that this lie should have disqualified her for the position. *Id.* at 21, 43. Second, Mr. Lebron argues that the DSS's focus on the candidates' experience with value-based payment initiatives was pretextual and designed to advantage Ms. Godburn in the application process. *See id.* at 43 (arguing that the DSS and Ms. McEvoy had no intention of hiring anyone other than Ms. Godburn, and that they "intentionally created questions

17

based on Ms. Godburn exposure to Value based Payment initiative and speaking in front of legislatures."). Third, Mr. Lebron argues that there is a broader trend of discrimination at the DSS, evidenced by the Department's racial demographics; the hiring and/or promotions of three white women to director or manager positions within the DSS; and the existence of the Upward Mobility Program, the DSS's affirmative action program, which, he argues, "admit[s] to past discrimination acts[.]" *Id.* at 19–20, 43.

The DSS responds that the instances of discrimination at the DSS put forward by Mr. Lebron cannot support his claim of discrimination with respect to the FAM 2 position. The DSS argues that it is undisputed that experience with value-based payment initiatives was an agency priority, and that Ms. Godburn had such experience while Mr. Lebron did not. Mem. at 5–6. It argues that the error in Ms. Godburn's application was harmless and had no effect on her eligibility, since she still met the minimum qualifications for the FAM 2 position. *Id.* It further argues that Mr. Lebron's additional years of service as a PCA did not translate to him being a more qualified candidate. *Id.* at 7. Finally, the DSS challenges specific details regarding the alleged hiring/promotions of white female candidates within the DSS and questions the relevance of Mr. Lebron's arguments regarding the Upward Mobility Program.

The Court agrees.

At the outset, the Court notes that there are two distinct types of disparate treatment claims under Title VII: individual claims and pattern-or-practice claims. *U.S. v. City of New York*, 717 F.3d 72, 83 (2d Cir. 2013). Pattern-or-practice claims focus on "allegations of widespread acts of intentional discrimination against individuals." *Reynolds v. Barrett*, 685 F.3d 193, 203 (2d Cir. 2012). "A pattern-or-practice claim under Title VII can be asserted either by the United States or by a class of plaintiffs, usually current or prospective employees against

whom some adverse employment action has been taken because of an impermissible reason such as race." *U.S. v. City of New York*, 717 F.3d at 82. "The principal difference between individual and pattern-or-practice discriminatory treatment claims is that, although both require an intent to discriminate, an individual claim requires an intent to discriminate against one person . . . and a pattern-or-practice claim requires that racial discrimination was the company's standard operating procedure, the regular rather than the unusual practice . . . and that the discrimination was directed at a class of victims[.]" *Id.* at 83 (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977)) (internal punctuation marks omitted).

"[T]he pattern-or-practice method of proof is not available to nonclass, private plaintiffs[, like Mr. Lebron.]" *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 150 (2d Cir. 2012). For individual claims, while statistics may bolster a *prima facie* case, they "alone do not suffice to establish an individual disparate treatment claim for a very good reason: the particular plaintiff must establish *he* was the victim of racial discrimination." *Reynolds*, 685 F.3d at 202 (emphasis in original).

Mr. Lebron's case rests on an individual claim regarding the DSS's failure to promote him to the FAM 2 position; it is not a "pattern-or-practice" claim because it is brought on behalf of a single plaintiff to challenge a single adverse employment action. Therefore, while Mr. Lebron may point to broader pattern or statistical evidence of discrimination to bolster his claim, he still must establish that the DSS intentionally discriminated against him. *Burdine*, 450 U.S. at 253 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.").

The Court addresses each of Mr. Lebron's arguments in turn.

First, Mr. Lebron has not provided any evidence to suggest that he was the superior

candidate for the FAM 2 position. Mr. Lebron makes much of the fact that Ms. Godburn's

application for the position incorrectly stated that she had been a PCA for six years, when she, in

fact, had only occupied that role for about eighteen months. He characterizes this discrepancy as

an intentional lie, told by Ms. Godburn in order to advance to the interview stage of the hiring

process, which should have disqualified her from the position entirely. Opp'n at 9, 21, 43. Mr.

Lebron, however, cites no evidence to support his contention that her error was intentional.

Moreover, he has not provided any evidence to support his argument that "Ms. Godburn should

have been disqualified for her lies but wasn't." *Id.* at 43. In fact, the certification of qualifications

required of each applicant for the FAM 2 position stated:

> I hereby certify that the statements made by me on this application form and attachments,
> if any, are true and complete to the best of my knowledge and are made in good faith. I
> understand that if I knowingly make any misstatement, misrepresentation, or omission of
> facts, I am subject to disqualification, not being considered further for or being
> terminated from employment and to such other penalties as may be prescribed by law or
> personnel regulations. All statements made on this application, including employment
> information, are subject to verification as a condition of employment.

Ex. 3 to Opp'n at 25, ECF No. 42 (Oct. 4, 2023). Mr. Lebron has provided no evidence to

suggest that Ms. Godburn made the untrue statement on her application in bad faith.

Furthermore, the certification does not state that the Agency must disqualify or terminate a

candidate if their application contains an untrue statement. Rather, according to the wording of

the attestation, such an error subjects the applicant to potential disqualification—and the Agency

retains discretion to decide how to handle any given situation. The DSS has explained that it

viewed Ms. Godburn's error as unintentional and ultimately harmless, since she met the

minimum qualifications for the job with only eighteen months' experience as a PCA (a

contention that Mr. Lebron has not challenged). Reply at 7.

Likewise, Mr. Lebron asserts that he "ha[d] significant experience over the less qualified

candidate that was chosen" but he has not submitted any evidence that his longer tenure as a

PCA made him more qualified than Ms. Godburn. In fact, the DSS has stated that Mr. Lebron's longer tenure as a PCA did not make him more qualified for the FAM 2 position than Ms. Godburn, since the Agency valued Ms. Godburn's experience with value-based payment initiatives more than Mr. Lebron's additional years of experience as a PCA. Mem. at 7 ("More years of service as a Principal Cost Analyst did not automatically make Plaintiff more qualified as it is undisputed that he failed to articulate in his interview that he had any targeted experience with value-based payment initiatives, which had been identified as an agency priority.").

Mr. Lebron has therefore failed to provide any evidence to suggest that he was a more qualified candidate than Ms. Godburn.

Second, Mr. Lebron suggests that the DSS's focus on value-based payment initiatives was pretextual and designed to advantage Ms. Godburn in the hiring process. Opp'n at 43. Mr. Lebron raises two points to support this argument, albeit indirectly. First, Mr. Lebron questions the extent of Ms. Godburn's qualifications regarding value-based payment initiatives. He points to an e-mail from Annie Jacob, which states that Ms. Godburn did not create the PCMH+ program that she cited in her interview as an example of her experience with value-based payment initiatives. Ex. 2, Opp'n at 24. Second, Mr. Lebron argues that value-based payment programs cannot have been a true Agency priority because Ms. Godburn has not actually worked on any value-based payment initiatives since she started in the FAM 2 role. *Id.* at 6 (stating that, since Ms. Godburn has been in the FAM 2 position, the DSS has not launched any value-based payment programs). Mr. Lebron has not provided any documentation or testimony to support this allegation.

Indeed, "[t]he Second Circuit has held that being qualified [for a given position] refers to the criteria the employer has specified for the position." *Thornley v. Penton Publishing*, 104 F.3d

26, 29 (2d Cir. 1997) (internal punctuation marks omitted). And, "[a]bsent a showing by the plaintiff that the employer's demands were made in bad faith . . . [a] plaintiff is not entitled to get his or her case before a jury by contending that the demands of the employer were not reasonably related to the performance of the job." *Id.* Without some evidence that the DSS's focus on value-based payment initiatives, and the resulting preferred qualifications for the FAM 2 position, were "in bad faith," Mr. Lebron has not created a genuine issue of material fact as to pretext.

Moreover, whether Ms. Godburn created the PCMH+ program is not material to the question of whether she had experience working with value-based payment programs. It is undisputed that Ms. Godburn had worked on the PCMH+ program; that this type of experience was a preferred qualification for the FAM 2 position listed in the job description; and that Ms. Godburn discussed her experience at her interview. Ms. Jacobs's e-mail therefore does not detract from Ms. Godburn's qualification as a candidate with relevant experience working on value-based payment initiatives. Regardless, even if the email did contain relevant information, because it is unsworn, it cannot be properly considered by the Court at this stage. *See, e.g.*, *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (Where the moving party has met its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.") (internal quotation marks omitted); *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 619 (S.D.N.Y. 2008) (holding that, at summary judgment, "unsworn e-mails are not admissible for their truth," although they may be introduced for other purposes).

Similarly, the question of whether Ms. Godburn has, in fact, worked on such initiatives since beginning in the FAM 2 role is not material. Value-based payment initiatives could have been an Agency priority, whether or not any such programs eventually came to fruition.

Regardless, the DSS disputes Mr. Lebron's claim. *See* Reply at 5 (the DSS states that, in response to one of Plaintiff's discovery requests, it indicated that that Ms. Godburn has worked on three value-based payment programs since she began in the new role in 2020). And Mr. Lebron has not provided any information to support his assertion that no such initiatives have been launched since Ms. Godburn began as a FAM 2. *See Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (explaining that the party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" and may not simply vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation") (citation omitted). Without record evidence, Mr. Lebron has failed to create a genuine issue of material fact with respect to the DSS's interest in value-based payment initiatives being pretextual.[4]

Finally, Mr. Lebron's arguments regarding a broader pattern of discrimination at the DSS are insufficient to create a genuine issue of material fact as to pretext. As discussed above, because Mr. Lebron has brought an individual claim under Title VII, statistical or systemic arguments alone are insufficient to support his claim. *See Reynolds*, 685 F.3d at 202 ("Statistics alone do not suffice to establish an individual disparate treatment claim[.]"). Rather, Mr. Lebron must demonstrate that there was some discriminatory intent related to DSS's failure to promote him, specifically. *Id.* ("[T]he particular plaintiff must establish he was the victim of racial

---

[4] In his memorandum in opposition to the motion for summary judgment, Mr. Lebron disputes several specific details related to the hiring process for the FAM 2 position, including the process for screening applicants and determining whether they met the minimum qualifications for the position; whether the Panelists or the hiring manager ultimately made hiring decisions; and who was responsible for writing the interview questions. Opp'n at 9–10, 20–21. In support, he has provided affidavits from Hector Massari, Jr. and Roderick Winstead, current and former DSS employees who have participated in interviewing and hiring candidates. Opp'n at 40–42. Because Mr. Lebron has failed to demonstrate any genuine issue of material fact regarding his claims of disparate treatment, the Court need not and will not weigh in on the particulars of the hiring process.

discrimination."). Having determined that Mr. Lebron's arguments regarding the DSS's failure to promote him are insufficient to raise a genuine issue of material fact for a jury to decide, the Court cannot allow the case to proceed on the basis of these broader allegations of systemic racial discrimination within the Department.

Even if this were not the case, Mr. Lebron has not put forth any evidence sufficient to demonstrate a pattern of discrimination at the DSS. As the DSS notes, allegations regarding the specific promotions or hiring of three white women to director or manager positions within the Department are not, alone, sufficient to establish discrimination. Without more information regarding the candidates who applied for the positions, their respective qualifications, and those hiring processes, the Court cannot make any inference regarding those employment actions. *Cf. Martinez*, 208 F. Supp. 3d at 487–88 (disregarding data regarding the defendant's failure to promote three individuals from within the plaintiff's protected class because the sample size was so small as to be statistically significant, and because the plaintiff failed to provide any information about the individuals' qualifications). Mr. Lebron's argument that the existence of an affirmative action program within the DSS signals the existence of ongoing racial discrimination similarly fails, since he has not established any record evidence from which a jury could draw such a conclusion.

As a result, Mr. Lebron has failed to put forth any evidence to suggest that the DSS's reasons for hiring Ms. Godburn were pretextual, or that the Agency, or any of its employees, made the decision based, even in part, on any discriminatory motive.

Accordingly, because no jury could reasonably find that Mr. Lebron was denied the

promotion on the basis of his race or gender, the Court will grant summary judgment to the DSS.

## IV.    CONCLUSION

For the foregoing reasons, the DSS's motion for summary judgment is **GRANTED.**

The Clerk of Court is respectfully directed to enter Judgment in favor of Defendant and to close this case.

SO ORDERED at New Haven, Connecticut, this 8th day of March, 2024.

_/s/ Victor A. Bolden_
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE
